UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZIA AHMAD ABDULRAHEEMZAI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, et al., <br><br> Defendants. | Case No. 25-cv-05098-JST <br><br> **ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING IN PART** <br><br> Re: ECF No. 16 |

In this case, Plaintiffs seek to compel United States Citizenship and Immigration Services ("USCIS") to adjudicate their asylum claims, which have been delayed in part by a presidential policy memorandum pausing all asylum application processing. Plaintiffs also challenge the policy memorandum itself, arguing that it is arbitrary and capricious, contrary to governing statutes, and violates the due process and equal protection components of the U.S. Constitution. Before the Court is Defendants' motion to dismiss for lack of jurisdiction and failure to state a claim. The Court will grant the motion in part and deny it in part.

## I.      BACKGROUND

### A.      Statutory & Regulatory Background

The Immigration and Nationality Act directs the attorney general to "establish a procedure for the consideration of asylum applications." 8 U.S.C. § 1158(d)(1). Such procedure "shall provide," in relevant part, the following:

> (ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;
> (iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

*Id*. § 1158(d)(5).  Section 1158(d), however, provides "no private right of action" and does not "create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers."  *Id*. § 1158(d)(7).

In September 2021, Congress passed the Extending Government Funding and Delivering Emergency Assistance Act, creating a program called Operation Allies Welcome ("OAW").  *See* Pub. L. 117-43, 135 Stat. 344 (2021).  OAW appropriated funding and implemented certain procedures to facilitate resettlement in the United States for Afghan evacuees put at risk by the 2021 Taliban operations in Afghanistan.  *Id*.  Section 2502 of the Act sets an "expeditious" adjudication timeline for asylum applications from Afghan citizens, nationals, or habitual residents paroled into the U.S. between July 31, 2021 and September 30, 2022 and their minor children or spouses.  Pub. L. 117-43, § 2502(a),(c), 135 Stat. 344, 377.  The Department of Homeland Security ("DHS") "shall":

> (1) conduct the initial interview on the asylum application not later than 45 days after the date on which the application is filed; and
> (2) in the absence of exceptional circumstances, issue a final administrative adjudication on the asylum application within 150 days after the date the application is filed.

*Id*. § 2502(c).  Section 2502 therefore appears to modify the basic asylum application processing timelines provided for in the INA in three ways.  First, it removes the exception for "exceptional circumstances" from the initial interview requirement.  Second, it decreases the window for final adjudication by 30 days.  Third, it omits any prohibition on a private right of action.

On December 2, 2025, the Trump Administration issued Policy Memorandum ("PM") 602-0192, pausing processing of all asylum applications for people of all nationalities and pausing benefits request processing for people from countries designated "high-risk" in Presidential Proclamation ("PP") 10949.  *See* Policy Memorandum 602-0192, Hold and Review of all Pending Asylum Applications and All USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025)[1]; Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and

---

[1] https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.

Public Safety Threats (June 4, 2025).[2]  The PM also directs USCIS personnel to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021."  PM 602-0192 at 1.

As justification, the PM cites two alleged incidents.  First, an Afghan national named Nasir Ahmad Tawhedi allegedly planned a terrorist attack in the United States on Election Day 2024.  PM 602-0192 at 2.  He later pled guilty to conspiring and attempting to provide support to ISIS.  *Id*.  In the second incident, an Afghan national named Rahmanullah Lakanwal is suspected of planning and executing a terrorist attack in Washington, D.C. against two National Guard members on November 26, 2025, leaving one dead and the other critically injured.  *Id*.

One day after the 2025 attack, USCIS issued a policy alert directing adjudicators to consider "negative, country-specific factors" when vetting noncitizens from the 19 high-risk countries listed in PP 10949.  U.S. Citizenship & Immigration Servs., USCIS Implements Additional National Security Measures in the Wake of National Guard Shooting by Afghan National (Nov. 27, 2025).[3]

Six days after the attack, defendant USCIS issued PM-602-0192.  The PM's pause on asylum and benefits application processing purports to enable USCIS "[t]o address vulnerabilities" and "to conduct a comprehensive review of all policies, procedures, and guidance" related to the entry or asylum processes.  PM 602-0192 at 2.  According to the PM, by March 2, 2026, USCIS would "prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate" and issue further "operational guidance."  *Id*. at 3.

On March 30, 2026, the Trump Administration announced that it would resume adjudication of certain asylum applications.  *See* U.S. Citizenship & Immigration Servs., Update on USCIS' Strengthened Screening and Vetting (Mar. 30, 2026).[4]  For individuals from 39 countries considered high-risk and subject to travel bans under PP 10949 and Presidential Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals to Protect the

---

[2] https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf.
[3] https://www.uscis.gov/newsroom/news-releases/uscis-implements-additional-national-security-measures-in-the-wake-of-national-guard-shooting-by.
[4] https://www.uscis.gov/newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting.

United States District Court
Northern District of California

United States District Court
Northern District of California

Security of the United States (Dec. 16, 2025)[5] the pause would continue indefinitely.  In the same announcement, USCIS found that "prior screening and vetting measures were wholly inadequate" and announced development of "a layered vetting plan, incorporating classified and unclassified information, as well as expanded criminal history checks, identity verification, and ad hoc security checks to close security gaps."

### B.    Factual & Procedural Background

Plaintiffs are four unrelated adult Afghan citizens and OAW parolees.  Plaintiff Zia Ahmad Abdulraheemzai was paroled into the U.S. on September 2, 2021, applied for asylum on June 13, 2022, interviewed with an asylum officer on August 16, 2022, and reinterviewed on December 3, 2025.  ECF No. 15 ¶ 2.  Plaintiff Madina Sultani was paroled into the U.S. on August 23, 2021, applied for asylum on August 3, 2022, and interviewed on September 16, 2022.  *Id.* ¶ 3.  Plaintiff Khwaja Sadrudin Sediqi was paroled into the U.S. on April 26, 2022, applied for asylum on August 15, 2022, interviewed on September 27, 2022, and reinterviewed on April 10, 2024.  *Id.* ¶ 4.  Finally, Plaintiff Azizullah Hayat was paroled into the U.S. on May 26, 2022, applied for asylum on September 30, 2022, interviewed on November 22, 2022, and reinterviewed on December 1, 2025.  *Id.* ¶ 5.

On June 17, 2025, Plaintiffs filed this action.  ECF No. 1.  They filed an amended complaint on December 24, 2025, bringing claims under the Administrative Procedure Act ("APA"), 5 U.S.C §§ 701–06, and the Mandamus Act, 28 U.S.C. § 1361, because their applications have been pending longer than 150 days.  ECF No. 15.  They also allege that PM 602-0192 violates the APA and U.S. Constitution.  *Id.*

Plaintiffs seek (1) a declaration that the delay in adjudicating their asylum applications is unreasonable; (2) a declaration that PM 602-0192 is unlawful under the APA, or alternatively, an order enjoining Defendants from applying it to any OAW applicants who have completed their asylum interview before USCIS, or alternatively, an order enjoining Defendants from applying it to Plaintiffs; and (3) an order requiring Defendants to adjudicate Plaintiffs' asylum applications.

---

[5] https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/.

ECF No. 15 at 17–18.

Plaintiffs, who initially received parole that has now expired, face unlawful status and legal uncertainty while they await processing of their asylum applications.  ECF No. 15 ¶ 30.

## II.    JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III.   LEGAL STANDARD

### A.    Rule 12(b)(1)

A district court must dismiss an action if it lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1), 12(h)(3).  Further, district courts only have jurisdiction to resolve cases or controversies in which the plaintiffs have standing.  *See* U.S. CONST. Art. III, § 2; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To establish Article III standing, "a plaintiff must show (1) [he or she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

### B.    Rule 12(b)(6)

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Factual allegations need not be detailed, but must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

United States District Court
Northern District of California

In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). A court may consider documents attached or incorporated by reference into the complaint, and matters of judicial notice, *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), including agency websites and publications, *Minor v. FedEx Office & Print Servs., Inc.*, 78 F. Supp. 3d 1021, 1027 (N.D. Cal. 2015).

## IV.    DISCUSSION

### A.    Reviewability of a National Security Directive & Plaintiffs' Standing

Defendants contend that "the Court should decline to intervene in Executive Branch national security determinations governing immigration adjudications." ECF No. 16 at 13. They argue that PM 60-0192 is fundamentally a national security directive because it references two national security incidents, adopts the list of "high-risk" countries listed in PP 10949, and purports to enable USCIS to review existing vetting procedures. ECF No. 16 at 14. Defendants identify no authority establishing that the Court should decline to review alleged violations of the law simply because they implicate national security concerns, so the Court will not dismiss the complaint on that basis.

Defendants argue that "courts have traditionally declined to intervene" where "the executive has determined that adjudications must temporarily halt to permit additional vetting and review in the interest of national security and public safety." ECF No. 16 at 13. The three cases Defendants cite, however, support Plaintiffs' position instead. In *Kapoor v. Blinken*, the court found an eighteen-month delay in scheduling immigrant visa interviews to be reasonable in part because of "substantial evidence that the COVID-19 pandemic has negatively impacted the [agency's] ability to provide visa services." No. 21-CV-01961-BLF, 2022 WL 181217, at *1 (N.D. Cal. Jan. 20, 2022). That decision did not mention national security. In *Iqbal v. Blinken*, the court found that the COVID-19 pandemic, logistical complications caused by the Taliban takeover of Kabul, and additional security screening applicable to the plaintiff's visa application "show[ed] an identifiable set of rationales for the delay in this case." No. 2:23-CV-01299-KJM-

United States District Court
Northern District of California

CSK, 2024 WL 3904959, at *9 (E.D. Cal. Aug. 22, 2024), *reconsideration denied sub nom. Iqbal v. Rubio*, No. 2:23-CV-01299-KJM-CSK, 2025 WL 1825413 (E.D. Cal. July 2, 2025).  Far from abstaining simply because the defendants cited national security concerns, the court reached the merits of the delay and declined to intervene only upon finding that the delay was reasonable. Plaintiffs ask this Court—like the courts in *Kapoor* and *Iqbal*—to adjudicate the merits of the alleged delay.

Defendants' third case, *Sulaiman v. Mayorkas*, is particularly inapposite.  That court remanded the plaintiff's request for a judicial determination of her naturalization application, finding that "USCIS's expertise in investigating, fact-finding, and adjudicating naturalization applications weighs in favor of remanding," especially because the plaintiff planned to submit evidence the agency had not yet evaluated.  No. 8:24-CV-01733-FWS-KES, 2024 WL 5410126, at *3 (C.D. Cal. Dec. 11, 2024).  Here, Plaintiffs do not seek a judicial determination of their asylum applications, but an order compelling the agency itself to exercise the very expertise identified in *Sulaiman* by adjudicating the applications itself.  And, as in *Kapoor*, *Sulaiman* did not appeal to national security concerns at all.  *Id*.

Defendants next cite a set of cases noting that "[t]he responsibility to regulate immigration policies . . . is entrusted to the political branches of the Federal Government, rather than the judiciary."  ECF No. 16 at 13.  None of these cases, however, suggests that courts should abstain from adjudicating alleged violations of the law.  *See Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (holding that a party bringing a constitutional challenge to line-drawing in the provision of immigration benefits "has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others" in recognition of Congress's power over immigration and naturalization); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 722–23 (D.C. Cir. 2022) (holding that while the "'inherent executive power' to govern foreign relations includes considerable authority over immigration[,] . . . Congress has sometimes limited [that] discretion"); *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999) (holding that the Court of Appeals should have applied *Chevron* deference to the Attorney General's interpretation of "serious nonpolitical crime").

United States District Court
Northern District of California

Finally, Defendants cite cases affording deference to the executive in national security matters. Again, none comes close to suggesting that this Court should decline to review alleged violations of statutes passed by Congress. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 529–30 (1988) (holding that the governing statute did not confer authority upon the Merit Systems Protection Board to review a decision to deny or revoke security clearance in the court of reviewing an adverse employment action); *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (holding that the justifications provided for a presidential proclamation restricting entry of individuals from certain countries sufficed to show that it comported with the governing statute); *Harisiades v. Shaughnessy*, 342 U.S. 580, 584, 596 (1952) (holding that expulsion of a noncitizen for past membership in the Communist Party did not violate the First Amendment, the Fifth Amendment, or the Ex Post Facto Clause of the U.S. Constitution).

In their supplemental brief, Defendants argue that "where USCIS has shown specific developments and a commitment to further developing effective vetting measures, this Court should decline to involve itself in overriding an ongoing national security determination and judgment contemplated by the Director of USCIS." ECF No. 23 at 3. But Defendants still identify no authority persuading the Court to abstain from adjudicating alleged violations of the APA, Mandamus Act, and U.S Constitution, simply because national security concerns are at play.

Defendants next argue that Plaintiffs lack standing to bring their claims because "while an operative agency directive currently governs asylum adjudications, the relief Plaintiffs seek is unavailable during the pendency of that directive," so Plaintiffs cannot establish redressability. ECF No. 16 at 16. But,  as Plaintiffs argue, "[a]n agency cannot defeat jurisdiction or insulate itself from judicial review by announcing that it will not comply with its statutory duties." ECF No. 19 at 14. Defendants have failed to show that this Court must or should refrain from reviewing PM 602-0192. As such, the relief Plaintiffs seek is available through a court order invalidating the PM on one or more of the grounds advanced by Plaintiffs. *See Ghahrisarabi v. Noem*, No. 25-CV-08546-KAW, 2026 WL 194738, at *1 (N.D. Cal. Jan. 26, 2026) (noting that "regardless of [PM 602-0192], the instant case is still subject to judicial review as to whether there is unreasonable delay in adjudicating [Plaintiff's] application").

United States District Court
Northern District of California

B.     APA Claims

Plaintiffs assert claims under two related provisions of the APA.  First, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1). Second, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id*. § 706(2). Section 555(b) of the APA also requires that each agency "within a reasonable time . . . proceed to conclude a matter presented to it."  The APA does not confer jurisdiction, however, over agency actions "committed to agency discretion by law."  *Id*. § 701(a)(2).

### 1.     Section 706(2)

#### a.     Arbitrary and Capricious

An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id*.

The complaint claims that "[a] complete suspension of asylum applications and applications from Afghanistan and other 'high risk' countries based on the illegal acts of two individuals i[s] the very definition of arbitrary and capricious, effectively punishing over one million asylum applications pending before USCIS, as of 2023 according to DHS."  ECF No. 15 ¶ 53.  "Moreover, the policy memo's sole provision for applicants to request the agency to 'lift the hold'" is also arbitrary and capricious.  *Id*.

Defendants do not argue that Plaintiffs have failed to adequately allege that PM 602-0192 is arbitrary and capricious, so the Court will not dismiss this claim on that basis.  *See* ECF No. 16 at 22.  They do argue that Plaintiffs have failed to allege how PM 602-0192 is unlawful as applied

9

to Plaintiffs because their arguments instead "clearly refer to PM 602-0192 as applied to all OAW Applicants." *Id*. at 23. "Plaintiffs have asserted no concrete claim as to why PM 602-0192, which pauses all asylum applications equally for the reason of national security and evaluating vetting procedures, is arbitrary and capricious as solely applied to Plaintiffs." *Id*. But there is no requirement that Plaintiffs make a special showing that the PM is arbitrary and capricious "as solely applied to" them; it is sufficient for them to plead that the policy is arbitrary and capricious in general and that they have been harmed by it.

In any event, Plaintiffs also respond that they have "sufficiently pleaded that PM 602-0192 is arbitrary and capricious as applied to them" because they "all entered the U.S. as OAW parolees and as such were subjected to rigorous vetting procedures, their applications have all been pending longer than the statutory period set forth in [Section 2502], the government has not alleged 'extraordinary circumstances' in any of their cases, no Plaintiff has any criminal history, and each Plaintiff has undergone their asylum interview before a USCIS officer." ECF No. 19 at 22. Thus, if a special showing were required that the policy is arbitrary and capricious as applied to them, this explanation would appear to suffice.

### b.    Ultra Vires

The complaint alleges that the PM "is ultra vires to the extent that it suspends adjudication of immigration applications of individuals already present in the United States" because doing so exceeds the President's authority to suspend entry of noncitizens under 8 U.S.C. § 1182(f). ECF No. 15 ¶ 54.[6] It also alleges that the asylum pause violates the law to the extent that it causes final

---

[6] Section 1182(f) provides, in relevant part,

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

The motion to dismiss does not appear to directly address this claim. The Court notes, however, that the adjudication pause itself does not appear to bar individuals from entering or applying for asylum and therefore does not appear to implicate Section 1182(f). In any amended complaint, Plaintiffs may reallege their ultra vires claim.

10

decisions on the asylum applications of OAW applicants to be delayed beyond 150 days from the date the application is filed. *Id*. ¶ 47.

The parties dispute whether the INA and Section 2502 create mandatory deadlines or aspirational guidelines for adjudication and whether those deadlines are enforceable through APA or mandamus relief. Certainly, the "no private right of action" provision forecloses private enforcement of the timeframes laid out in 8 U.S.C. § 1158(d)(5)(A). That does not mean, however, that those deadlines are merely permissive. Moreover, when Congress passed Section 2502 and tightened the final adjudication deadline for OAW applicants, it omitted any restriction, making Section 2502's deadlines both mandatory and enforceable.

Some district courts within this circuit have held that the time frames set forth in 8 U.S.C. 1158(d)(5) are a "suggested timetable" rather than a mandatory schedule because the statute disclaims a private right of action. *See, e.g.*, *Zhu v. Cissna*, No. CV 18-9698 PA (JPRX), 2019 WL 3064458, at *3–4 (C.D. Cal. Apr. 22, 2019);); *see also Varol v. Radel*, 420 F. Supp. 3d 1089, 1097 (S.D. Cal. 2019) (asserting without further explanation that "the plain language of 8 U.S.C. § 1158(d)(5)(A) clarifies that the timing requirements are not mandatory").

To the extent that these decisions can fairly be read to imply that Section 1158 does not create *any* duty to interview applicants and adjudicate applications on a particular timeline, this Court respectfully disagrees. While it may be true that an individual cannot sue to enforce the specific deadlines of Section 1158(d)(5) because of its prohibition on a private right of action, the use of the word "shall" nonetheless communicates a mandatory duty. *See Hui Dong v. Cuccinelli*, No. CV2010030CBMPLAX, 2021 WL 1214512, at *2 (C.D. Cal. Mar. 2, 2021) ("The use of the word 'shall' with respect to adjudication of an asylum application and the time frame for conducting an interview for an asylum application in the statute and regulations demonstrates that the adjudication of asylum applications is not a discretionary act." (citing 8 C.F.R. § 208.9; 8 U.S.C. § 1158(d)(5)(A)(ii)–(iii)). The *Zhu* and *Varol* courts, like Defendants here, conflate two distinct issues: whether a Congressional pronouncement is mandatory and the limitations placed on who may enforce it. *See* ECF No. 16 at 17.

Some courts have found that the statute's carveout for "exceptional circumstances" "vests

11

at least some degree of discretion to USCIS not to adjudicate an asylum application within 180 days" and thus weighs in favor of finding that the Section 1158 time frames are not enforceable. *Ma v. Jaddou*, No. 222CV04210MWFKS, 2022 WL 17254783, at *3 (C.D. Cal. Sept. 26, 2022; *see also Alaei v. Holder*, No. 2:15-CV-08906-ODW (JPRX), 2016 WL 3024103, at *3 (C.D. Cal. May 26, 2016); see ECF No. 16 at 18.

This Court respectfully disagrees with its peers as to the effect of the "exceptional circumstances" carveout.  While the carveout for exceptional circumstances lifts the statutory time frames in cases where exceptional circumstances are actually present, where such circumstances are absent the carveout has no effect.  *See Hui Dong*, 2021 WL 1214512, at *2 ; *cf. Poursina v. USCIS*, 936 F.3d 868, 871 (9th Cir. 2019) (holding that use of the term "may" creates a presumption of discretion, in contrast to "must" or "shall").  The plain language of the statute shows that Congress gave the agency the power to depart from the time frames set forth only if it could demonstrate the existence of "exceptional" circumstances.  8 U.S.C. § 1158(d)(5)(ii)–(iii). By choosing that term, Congress intentionally set a high bar.  *See Arredondo v. Lynch*, 824 F.3d 801, 806 (9th Cir. 2016) (holding, in the context of a noncitizen's failure to appear, that "exceptional circumstances" constitutes "a difficult burden to meet" (quoting *Magdaleno de Morales v. INS*, 116 F.3d 145, 148 (5th Cir. 1997)).  The exceptional circumstances carveout therefore only reinforces the Court's view that Section 1158(d)(5) creates a mandatory duty, even if it is not privately enforceable.

In addition to Section 1158(d)(5), Plaintiffs also rely on Section 2502.  As the Court previously outlined, Section 2502 modifies the Section 1158(d)(5) time frames in two relevant ways: by shortening by 30 days the time frame for final adjudication, and by removing the prohibition on a private right of action.  *See also* Section 2502(c) (setting an "expeditious adjudication" timeline for asylum applications).  The plain language of these provisions reflects a Congressional intent to prioritize OAW parolees and set them apart from general asylum applicants under Section 1158(d)(5).  And because the Court cannot assume that Congress omitted the prohibition on a private right of action by mistake, the logical conclusion is that Congress intended the Section 2502 time frames to be privately enforceable even where Section 1158(d)(5)

United States District Court
Northern District of California

12

is not.  *See, e. g., Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Defendants also argue that even if the statutory time frames are mandatory, they are not violated here because exceptional circumstances are present.  ECF No. 16 at 18–19.  Namely, the security incidents cited in PM 602-0192—the planned Election Day terrorist attack and the shooting of two members of the National Guard—justify "additional time to ensure all vulnerabilities in the vetting and security review of all individuals applying for asylum are addressed."  *Id*.; *see also* ECF No. 16 at 20 ("[T]he USCIS Director has determined that all adjudications must be paused while a review of procedures occurs, based on the exceptional circumstance of unprovoked violence by individuals who were previously vetted with the then-existing procedures.").  This argument is completely at odds with the meaning of "exceptional" because it seeks to lump together every pending asylum review.  "Exceptional" means "forming an exception," "rare," or "deviating from the norm."  Merriam Webster's Collegiate Dictionary 435 (11th ed. 2003); *see also Kaneka Corp. v. Zhejiang Med. Co.*, No. 2:11-CV-02389-MRP-SS, 2014 WL 12573845, at *2 (C.D. Cal. May 23, 2014) ("An exceptional case is a case that is rare, uncommon, or different from the ordinary case.").  It is not possible, as a matter of language or common sense, for every pending asylum case to be exceptional.  And nothing in either the statute or the PM itself suggests that "exceptional circumstances" were meant to trigger the complete cessation of statutory asylum adjudication as opposed to affect the timeline of an individual case.

Plaintiffs' claim that the PM is unlawful under APA Section 706(2)(C) insofar as it causes the agency to violate the 150-day adjudication requirement set forth in Section 2502 may proceed.

### c.      Claims Under the U.S. Constitution

Plaintiffs also bring claims under APA Section 706(2)(B) for violations the due process and equal protection clauses of the United States Constitution.  ECF No. 15 ¶¶ 57–61.

### i.      Procedural Due Process

Courts analyze procedural due process claims in two steps, first determining whether the

13

plaintiff "was deprived of a constitutionally protected liberty or property interest," and second, examining whether "that deprivation was accompanied by sufficient procedural protections." *Johnson v. Ryan*, 55 F.4th 1167, 1179–80 (9th Cir. 2022).  To determine whether the procedural protections provided are sufficient, courts analyze (1) the private interest affected; (2) the risk of an erroneous deprivation and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In the complaint, Plaintiffs allege that the "abrupt decision to pause all asylum adjudication indefinitely without providing plaintiffs notice, adverse evidence, or opportunity to confront and respond to such evidence violates plaintiffs' procedural due process rights."  ECF No. 15 ¶ 59. "Defendants' refusal to adjudicate plaintiffs' applications additionally violates plaintiffs['] Fifth Amendment due process liberty rights including interference with family unity and unduly limiting domestic and international travel."  *Id*. ¶ 60.

Plaintiffs have failed to identify a cognizable liberty or property interest.  As Defendants note, the Supreme Court has rejected procedural due process claims based on noncitizens' interests in family unity or travel.  ECF No. 16 at 25; *see Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024) (finding that there is no fundamental liberty interest in residing with a noncitizen spouse in the United States); *Haig v. Agee*, 453 U.S. 280, 306 (1981) (distinguishing the "*freedom* to travel outside the United States," which "is subject to reasonable governmental regulation," from the "*right* to travel within the United States" (emphasis in original)).[7]

In their opposition to the motion to dismiss, Plaintiffs argue that the operative protected liberty interest is one "in remaining free from physical custody."  ECF No. 19 at 23.  Specifically, they argue that "[b]ecause the Government has left Plaintiffs' asylum applications unresolved, Plaintiffs remain indefinitely out of status and subject to arrest and detention for immigration violations."  *Id*.  Neither the complaint nor the opposition, however, offers any evidence that Plaintiffs are likely to be detained.  And to be "in custody" requires a set of circumstances not present here.  Moreover, the connection between the procedures sought—adjudication of asylum

---

[7] As Defendants point out, Plaintiffs provide no evidence or argumentation suggesting that their ability to travel domestically is harmed by the asylum processing pause.  ECF No. 16 at 25 n.8.

applications—and the liberty interest—freedom from detention—is too attenuated to support a claim, especially given that Plaintiffs will not necessarily be granted asylum.

Plaintiffs' claim for a violation of their procedural due process right is dismissed.

### ii.    Equal Protection

Plaintiffs allege that PM 602-0192 "violates the Fourteenth Amendment's equal protection clause by discriminating based on national origin." ECF No. 15 ¶ 61. "The policy lacks a rational basis and violates the Constitution by placing a hold on all benefit requests for aliens from countries considered 'high-risk' which includes Afghanistan." *Id.* The complaint also states that "the administration has essentially admitted that the adjudication suspensions are based on animus to entire nationalities of applicants," quoting Defendant DHS Secretary Noem as writing publicly that she is "recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies," and quoting President Trump as stating that he would "permanently pause migration from all third world countries." ECF No. 15 ¶ 32.

In their motion to dismiss, Defendants point out that the asylum pause originally applied to all applicants, "regardless of the alien's country of nationality." PM 602-0192 at 1. They therefore argue, as Plaintiffs assume in their complaint, that rational basis review applies. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Where there are "plausible reasons" for the challenged action, the "inquiry is at an end." *Id.* at 314 (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). Defendants aver that the text of PM 602-0192 provides an adequate rationale to explain the decision to pause all asylum applications by citing the two alleged security incidents and the need to review existing vetting procedures. ECF No. 16 at 26. Plaintiffs respond that this justification "does not rationally serve to advance the stated interest of national security, particularly of individuals already present in the U.S. and those who have experienced prior vetting." ECF No. 19 at 25. This argument, however, is not responsive to the PM's position that *more* vetting is required, which is at least plausible. The

15

Court will dismiss this portion of the equal protection claim.[8]

In their opposition to the motion to dismiss, Plaintiffs also ask the Court to assess whether the explanation provided in the PM is pretextual. ECF No. 19 at 25. Neither the complaint nor the opposition provides a basis for the Court to identify pretext for an underlying discriminatory motive. For instance, while the complaint describes President Trump as "contemptuously refer[ring] to Afghanistan as a 'hellhole on earth,'" ECF No. 15 ¶ 31, that does not necessarily undermine a rationale based on the need to enhance existing vetting and is too general to evince pretext. *Cf. Trump v. Hawaii*, 585 U.S. at 705 (holding that while the court "may consider plaintiffs' extrinsic evidence [of alleged pretext]," it "will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds"). Likewise, the allegation that Noem called immigrants from some unspecified countries "killers, leeches, and entitlement junkies," also does not clearly show that the PM resulted from bias against particular nationalities. *Id.* ¶ 32. Similarly, while the opposition states that "Defendants have continuously made policy to restrict and prevent immigration specifically from predominately non-white countries," it does not specify these policies or identify corresponding allegations in the complaint. ECF No. 19 at 25. It also notes "glibly xenophobic and racist comments by . . . Defendant Noem" but again does not describe those comments or locate them in the complaint. *Id.* at 26.

The motion to dismiss does not address the complaint's separate claim concerning the suspension of benefits adjudications only for individuals from high-risk countries, so the Court does not dismiss this portion of the equal protection claim. *Id.*

Finally, in their supplemental brief, Plaintiffs also aver that the March 30, 2026 changes to

---

[8] The Ninth Circuit has noted that "the equal protection argument can be folded into the APA argument" where "no suspect class is involved and the only question is whether the defendants' treatment of [the plaintiff] was rational (i.e., not arbitrary and capricious)." *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955 (9th Cir. 2011). Here, Defendants argue that Plaintiffs have failed to state a claim for an equal protection violation under the rational basis test without also arguing that the complaint fails to state a claim that the PM was arbitrary and capricious. Nonetheless, because the Court dismisses the equal protection claim and the arbitrary and capricious claim is subject to a similar analysis, the Court grants leave to amend the arbitrary and capricious claim as well.

United States District Court
Northern District of California

the policy exacerbate the alleged national origin discrimination by allowing asylum application processing to proceed for all countries not designated high-risk. ECF No. 24 at 3. The Court grants Plaintiffs leave to amend the complaint to add allegations concerning the effect of the March 30 policy changes.

### d.    Scope of Relief

Defendants argue that one of Plaintiffs' requested remedies—a nationwide injunction setting aside PM 602-0192 as to every OAW applicant—is unavailable under *Trump v. CASA*, 606 U.S. 831, 861 (2025). ECF No. 16 at 22. In *CASA*, the Supreme Court held that district courts must narrowly tailor equitable remedies to offer complete relief to the plaintiffs before the Court, effectively prohibiting nationwide injunctions under most circumstances. 606 U.S. at 852. Under that holding, Plaintiffs' alternative request for an injunction barring Defendants "from applying Policy Memorandum PM-602-0192 to all OAW asylum applicants who have completed their asylum interview before USCIS" is foreclosed insofar as it goes beyond what is necessary to afford complete relief to the Plaintiffs.

*CASA*, however, does not affect Plaintiffs' request that the Court "hold unlawful and set aside" PM 602-0192 under APA Section 706(2).[9] The majority opinion in *CASA* noted that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action" under 5 U.S.C. § 706(2). 606 U.S. at 847 n.10. And while the Ninth Circuit has recognized "difficult and unanswered questions related to the limits of APA relief under Trump v. CASA," it has also declined to go further than that opinion in restricting relief under 706(2). *Nat'l TPS All. v. Noem*, 166 F.4th 739, 767 (9th Cir. 2026).

As Defendants argue, "when a reviewing court finds an agency action arbitrary and capricious 706(2)(A), the standard remedy is to vacate the decision and remand to the agency for

---

[9] Defendants suggest that the complaint requests only a universal injunction without also requesting a set aside order under APA Section 706(2). ECF No. 20 at 12 ("Plaintiffs, in their Opposition, pivot to seeking a 'set aside' of PM 602-0192."). But the complaint clearly cites to 5 U.S.C. § 706(2)(A)–(D), ECF No. 15 ¶ 53, and explicitly requests the Court "[d]eclare that the Policy Memorandum PM-602-0192 is unlawful within the meaning of the APA and is arbitrary and capricious . . . and not in accordance with law and should be set aside," *id*. at 17 ¶ 4.

17

reconsideration." ECF No. 16 at 23 (citing *Biden v. Texas*, 597 U.S. 785, 807–08 (2022)). This is the exact remedy Plaintiffs seek—vacatur of PM 602-0192, at which point USCIS may reissue a PM that complies with the APA and relevant governing statutes.

### 2.    Section 706(1)

"[Section] 706(1) empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (citation modified). "Thus, a court may compel agency action under the APA when the agency (1) has 'a clear, certain, and mandatory duty,' and (2) has unreasonably delayed in performing such duty." *Vaz v. Neal*, 33 F.4th 1131, 1136 (9th Cir. 2022) (quoting *Plaskett v. Wormuth*, 18 F.4th 1072, 1082 (9th Cir. 2021)). "The agency action must be pursuant to a legal obligation 'so clearly set forth that it could traditionally have been enforced through a writ of mandamus.'" *Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075–76 (9th Cir. 2016) (quoting *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010)).

Claims for unreasonable delay under Section 706(1) are assessed using factors articulated by the D.C. Circuit in *Telecommunications Research & Action v. F.C.C.* ("*TRAC*"), 750 F.2d 70, 79–80 (D.C. Cir. 1984), and subsequently adopted by the Ninth Circuit in *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997). The TRAC factors are:

> (1) the time agencies take to make decisions must be governed by a 'rule of reason'[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason [;] (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake [;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by the delay[;] and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Babbitt*, 105 F.3d at 507 n.7 (quotation marks and citation omitted).

Defendants' argument that no duty is present here because the time frames set forth in Section 1158(d)(5) and Section 2502 are not mandatory is therefore misplaced. ECF No. 16 at

21–22.  As Plaintiffs argue, "Defendants conflate discretion over asylum outcomes with discretion to refuse to act at all."  ECF No. 19 at 13.  Even if the Court agreed that Section 2502 did not create a mandatory timeframe, this would not prevent Plaintiffs from bringing an action under Section 706(1) for unreasonable delay.  Plaintiffs need only show that the agency is required to adjudicate their asylum claims—not that it is required to do so within a certain window.

This is true for several reasons.  First, the text of the APA requires only "unreasonable" delay.  5 U.S.C. § 706(1).  "Unreasonable" implies a flexible analysis, not a binary assessment of compliance with mandatory deadlines.  Second, the *TRAC* factors also do not require mandatory deadlines, but a "rule of reason" to govern the time agencies take to make the decision at issue.  *Babbitt*, 105 F.3d at 507 n.7.  Moreover, "timetable[s] or other indication[s] of the speed with which [Congress] expects the agency to proceed" suffice to provide a rule of reason.  *Id*.  Finally, APA Section 555(b) provides that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555(b).  "This provision imposes a non-discretionary duty on USCIS to adjudicate asylum applications within a reasonable time."  *Doe v. Dep't of Homeland Sec.*, No. 23-CV-2, 2024 WL 1603567, at \*2 (E.D. La. Apr. 12, 2024) (citing *Ahmed v. Bitter*, No. 22-CV-2474, 2024 WL 1340255, at \*2 (S.D. Tex. Mar. 28, 2024)).

Defendants do not argue that they are empowered to decline to adjudicate asylum applications.  As they note, "[t]he Executive may grant asylum.  Or it may not.  It is a matter of executive 'discretion.'"  ECF No. 16 at 14 (quoting *Huisha-Huisha*, 27 F.4th at 730).  But that is a far cry from claiming the Executive has the authority to refuse to adjudicate altogether, which it does not.  *See Titov v. U.S. Citizenship & Immigr. Servs.*, No. 1:24-CV-5295(FB), 2026 WL 673247, at \*2 (E.D.N.Y. Mar. 10, 2026) (allowing an action under Section 706(1) to proceed because "[i]t is undisputed that USCIS has a non-discretionary duty to rule on asylum applications"); *Ji v. U.S. Citizenship & Immigr. Servs.*, No. 24-CV-4815-SJB, 2026 WL 171879, at \*3 (E.D.N.Y. Jan. 22, 2026) (noting that the defendants do not dispute "that they are required to adjudicate Ji's application," but only "whether they have unreasonably delayed doing so"); *Machado v. U.S. Dep't of Homeland Sec.*, No. 25-CV-21846, 2025 WL 4676015, at \*7 (S.D. Fla.

19

Nov. 13, 2025), *report and recommendation adopted in part, rejected in part on other grounds*, No. 25-CV-21846, 2026 WL 411696 (S.D. Fla. Feb. 13, 2026) (finding that Defendants' statutory duty to adjudicate immigration applications is nondiscretionary); *see also Singh v. Still*, 470 F. Supp. 2d 1064, 1067 (N.D. Cal. 2007) (citing *Yu v. Brown,* 36 F.Supp.2d 922, 931 (D.N.M.1999)) (finding that the duty to act on the plaintiff's adjustment of status application is not discretionary because "there is a difference between the INS's discretion over *how* to resolve an application and the INS's discretion over *whether* it resolves an application).

As numerous courts in this circuit and nationwide have found, a Section 706(1) claim for unreasonable delay in adjudicating an asylum application may proceed notwithstanding the unenforceable nature of the Section 1158(d)(5) time frames. *See Fangfang Xu v. Cissna*, 434 F. Supp. 3d 43, 52 (S.D. N.Y. 2020) ("Plaintiff's right to adjudication within a reasonable time exists independently of § 1158(d), and the Court concludes that § 1158(d)(7) is not so broad as to strip Plaintiff of her right to challenge all delays in the adjudication of her asylum application, no matter how egregious."); *Zheng v. Mayorkas*, No. 22-CV-95, 2023 WL 4112938, at \*4 (N.D. Miss. June 21, 2023) ("[T]he fact that Section 1158(d)(7) preclude[s] the stand-alone INA claim [does] not mean that it preclude[s] all claims," including a claim under the APA); *Ji*, 2026 WL 171879, at \*3 ("Although these timelines are not 'mandatory'—section 1158(d)(7) provides that there is no private right of action to enforce them—the deadlines are still considered under the second *TRAC* factor.").

Defendants cite *Beshir v. Holder*, which found that where "the pace of adjudication is discretionary," "neither the APA nor the Mandamus Act provides a basis for this Court to assert jurisdiction over Beshir's claim of unreasonable delay." 10 F. Supp. 3d 165, 174 (D.D.C. 2014). *Beshir* contains no persuasive reasoning to suggest that a delay may not be unreasonable merely because no particular time frame is mandated. Indeed, it contradicts the authorities cited above and the *TRAC* factors themselves, which require consideration of Congressionally-provided timetables for adjudication without reference to whether those timetables are mandatory. Finally, it is worth noting that *Beshir* evaluated the context of adjustment of status applications, the statutes governing which provided no timelines for adjudication at all. 10 F. Supp. 3d at 173–74

20

(citing 8 U.S.C. § 1159(b) and 8 U.S.C. § 1255(a)).

Defendants also cite *Alaei*, which concluded that because the statutory time frames are lifted for exceptional circumstances, "[t]he statute thus vests at least some degree of discretion in the agency" and thus "is not the type of ministerial command that gives rise to a claim under [Section] 706(1)." 2016 WL 3024103, at *3. But again, *Alaei* misinterprets the law. Actions under 706(1) may compel not only "ministerial or non-discretionary act[s]," but also that the agency "take action upon a matter, without directing *how* it shall act." *Norton*, 542 U.S. at 64. In other words, Section 706(1) allows an agency to be compelled to perform a mandatory adjudication. Like Defendants, *Alaei* conflates the timeframe for performing a task, which supplies a "rule of reason" under the TRAC factors, with the task itself, which need only be a mandatory duty.

Defendants have stated a claim under Section 706(1) for unreasonable delay in adjudicating their asylum applications.

### 3.     Section 701(a)(2)

Section 701(a)(2) of the APA exempts from the purview of the statute agency actions that are "committed to agency discretion by law." This is a "narrow exception" that applies when there are no "judicially manageable standards" providing law for a court to apply. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Defendants argue that "the APA does not confer jurisdiction where the relief sought would require a court to dictate the timing or sequencing of agency action that Congress has left to agency discretion." ECF No. 16 at 17. There are several problems with this argument. First, it implies that no action under APA Section 706(1) for unreasonable delay could ever be sustained unless the law provides mandatory deadlines, a proposition this Court has already rejected. Second and relatedly, it fails to acknowledge that Section 555(b) of the APA also provides law to apply by requiring adjudication "within a reasonable time." Third, as the Court concluded above, Section 2502 does provide enforceable mandatory timelines. Finally, this argument has no bearing on Plaintiffs' claims under APA Section 706(2) alleging that PM 602-0192 is arbitrary and capricious, unlawful, and violates the Constitution.

21

## C.    Mandamus

The mandamus statute, 28 U.S.C. § 1361, authorizes actions "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." "Mandamus is an extraordinary remedy and is available to compel a federal official to perform a duty only if: (1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available." *Patel v. Reno*, 134 F.3d 929, 931 (9th Cir. 1997).

"Because 'mandamus relief and relief under the APA are in essence the same,' when a complaint seeks relief under the Mandamus Act and the APA and there is an adequate remedy under the APA, [courts] may elect to analyze the APA claim only." *Vaz*, 33 F.4th at 1135 (quoting *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 (9th Cir. 1997)).  The Court finds that Plaintiffs have adequately pleaded a claim under APA Section 706(1), so Plaintiffs' alternative claim under the mandamus statute likewise survives the motion to dismiss.

## D.    Severance

Federal Rule of Civil Procedure 20 allows plaintiffs to join together in one action if "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action."  Even once these requirements are met, a district court must examine whether permissive joinder would 'comport with the principles of fundamental fairness' or would result in prejudice to either side." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (quoting *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980)).  "If the test for permissive joinder is not satisfied, a court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by the severance." *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997).

Defendants have not persuaded the Court that severance is required.  While the Plaintiffs' claims differ slightly in the exact timing of their initial applications and interviews, Defendants have not shown that those differences are relevant.  And while Defendants argue that the merits of the Plaintiffs' asylum claims may be meaningfully distinct and require individual adjudication,

22

ECF No. 16 at 28, the complaint does not seek a judicial determination of the merits of those claims. *See* ECF No. 19 at 27 ("Plaintiffs do not ask the court to dictate how USCIS should exercise its discretion or what outcome it should reach."). Finally, Defendants identify no prejudice caused by the joinder. Joint evaluation of Plaintiffs' claims utilizes the resources of the parties and the Court most efficiently.

**CONCLUSION**

The motion to dismiss is granted in part and denied in part as set forth above. Plaintiffs may file an amended complaint within 28 days of the date of this order solely to correct the deficiencies identified in this order.

**IT IS SO ORDERED.**

Dated: April 24, 2026



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California